# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THE DETROIT MEDICAL CENTER,

        Plaintiff,                            Case No. 02-74219

v.                                     Hon. Gerald E. Rosen

AFSCME MICHIGAN COUNCIL 25,
AFSCME LOCALS 181, 3695, and 140,
HOSPITAL EMPLOYEES DIVISION OF
LOCAL 79 SEIU, and RONNIE O'NEAL,

        Defendants.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on___March 28, 2006_____

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

In this action, Plaintiff Detroit Medical Center ("Plaintiff" or "DMC") seeks to overturn an arbitrator's decision ordering the reinstatement with back pay of a DMC employee, Ronnie O'Neal.  Plaintiff contends that the arbitrator exceeded his authority by awarding relief that, in Plaintiff's view, lacks any basis in the terms of the collective bargaining agreement negotiated between the DMC and the Defendant unions, AFSCME Michigan Council 25 and AFSCME Locals 181, 3695, and 140 ("Defendant" or the

"Union").[1]

Through cross-motions now pending before the Court, each of the parties now seeks summary judgment in its favor.  In their respective motions, the parties have agreed, at least for present purposes, upon the facts as stated in the arbitrator's decision, but they disagree as to whether the resulting decision under these facts represents an appropriate exercise of the arbitrator's authority to interpret and apply the terms of the parties' collective bargaining agreement.

Having reviewed the parties submissions and the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are sufficiently presented in these materials, so that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs."  See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. Under the "very narrow" standard of review that governs this matter, see Lattimer-Stevens Co. v. United Steelworkers, Sub-District 5, 913 F.2d 1166, 1169 (6th Cir. 1990), the Court readily concludes that the arbitrator's decision is entitled to enforcement.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

As noted, the parties have agreed, for present purposes, to accept as true the

---

[1]Although Plaintiff also has named Hospital Employees Division of Local 79 SEIU and Ronnie O'Neal as defendants, AFSCME Michigan Council 25 and its locals maintain that they are the only proper parties to this suit, and that the remaining defendants should be dismissed. The Court need not decide this matter, but will refer to AFSCME Michigan Council 25 and its locals collectively as "Defendant" or the "Union" throughout the balance of this opinion.

2

factual findings set forth in the arbitrator's decision.  Accordingly, the Court's recitation of facts is drawn from this source.

The challenged arbitrator's decision arises from a grievance filed by Ronnie O'Neal to protest his discharge as an employee of Plaintiff Detroit Medical Center ("DMC").  At the time of the incident that led to his discharge, O'Neal was on probation, apparently due to discipline imposed for prior work rule violations, so that any further infraction could result in his immediate discharge.  During his shift on the night of February 7-8, 2001,[2] O'Neal was away from his assigned workstation, and could not be located for over two hours.  In light of this evident violation, O'Neal's supervisors determined that some sort of discipline was warranted, up to and including discharge.

Under the pertinent DMC human resources policy, a "disciplinary investigative meeting" must be held prior to the imposition of discipline that could result in suspension or termination.  Because O'Neal faced a possible discharge, his supervisors scheduled a disciplinary investigative meeting for the morning of February 14, 2001.  By this time, O'Neal evidently would have completed two scheduled workdays following the February 8 incident, with an intervening Martin Luther King holiday weekend falling in between these two dates.

Both DMC management and Union representatives attended the scheduled

---

[2]There is a discrepancy in the arbitrator's decision as to whether the incident at issue occurred on O'Neal's February 7-8 shift or his February 8-9 shift, but this has no bearing upon the issues before the Court.

February 14 meeting. According to the arbitrator, the director of O'Neal's unit at the DMC, Crys Kuykendall, "was planning to notify [O'Neal] of his termination at that time." (Plaintiff's Motion, Ex. A, Arb. Decision at 6.) Yet, O'Neal did not appear for this meeting, and it was later learned that he had requested and been granted the day off as vacation.

By agreement among the DMC and Union representatives, the meeting was rescheduled for February 21, 2001. Once again, however, it was learned that O'Neal had been given that day off as vacation, so the meeting was rescheduled for the following day. When O'Neal called in sick, the meeting was again rescheduled, this time for February 28, 2001.

Although O'Neal appeared at his work site on February 28, he refused to attend the scheduled disciplinary investigative meeting. Instead, he submitted paperwork requesting a two-month leave of absence due to "stress." (See id. at 7.) When asked why he declined to attend the investigative meeting that day, "he screamed his resentment for being bothered while he was on leave of absence." (Id.) His request for leave subsequently was granted, retroactive to his absence on February 21.

Upon O'Neal's return from his medical leave for the midnight shift on April 30, 2001, he was advised that he could not return to work until he had attended an investigative meeting regarding the February 8 incident. The meeting was held the next morning, May 1, and O'Neal was given an opportunity to present his version of the facts

4

surrounding his apparent absence from his workstation for over two hours.  Yet, as stated

by the arbitrator, O'Neal failed to provide any support for his contentions (i) that he had

been seen by a co-worker at his workstation during this purported two-hour period of

absence, and (ii) that his past disciplinary record did not establish his probationary status

or warrant a discharge.  Accordingly, the DMC's human resources representative

recommended O'Neal's termination, and he was placed on suspension pending the

requisite upper management approval of this action.

O'Neal then filed a union grievance challenging his discharge.  After exhausting

the grievance process, the parties submitted their dispute for arbitration in May of 2002.

On behalf of O'Neal, the Union advanced both substantive and procedural challenges to

the discharge.  As to the latter, the Union asserted that the DMC had violated Article IX,

Section 3 of the parties' collective bargaining agreement by failing to provide O'Neal

with notice of his discharge within three scheduled work days after the infraction that led

to this discharge.  The DMC, in contrast, argued that it had complied with the spirit, if not

the letter, of this collective bargaining agreement provision by promptly scheduling an

investigative meeting within the three-day limit, and that it was only because of O'Neal's

apparent evasion of this meeting that he did not receive notice of his discharge within

three work days of his February 8 infraction.  Thus, even assuming that it had committed

some minor technical violation of the collective bargaining agreement, the DMC argued

that any award of relief should be limited to nominal back pay encompassing the period

of delay in providing O'Neal with notice of his discharge.

In a decision dated August 1, 2002, arbitrator David S. Tanzman sustained the Union's procedural challenge and ordered the reinstatement of O'Neal with back pay. While acknowledging that the DMC's human resources policies call for an investigative meeting before the imposition of discipline that could result in suspension or termination, the arbitrator found that this policy did not override the DMC's obligation under the collective bargaining agreement to notify an employee of his discharge within three work days after the underlying infraction that led to the discharge. Thus, although the DMC's representatives had attempted to conduct the investigative meeting promptly after O'Neal's unexplained absence from his workstation, and although the ensuing delay in this meeting was attributable to O'Neal's failure to attend on multiple occasions, rather than any negligence on the part of the DMC, the arbitrator found nothing in these circumstances that would excuse the DMC from complying with the strict three-day notice provision set forth in the collective bargaining agreement.

The DMC then filed a petition for reconsideration, arguing, among other things, that the arbitrator's decision was inconsistent with the opinions of other arbitrators regarding the interplay of the DMC's investigative meeting requirement and the collective bargaining agreement's three-day notice provision. In a letter dated October 7, 2002, the arbitrator denied this petition and reaffirmed his decision. This suit followed, with the DMC seeking to overturn the arbitrator's decision and the Union seeking its

6

enforcement.

## III.  ANALYSIS

**A.      The Standards Governing the Parties' Cross-Motions**

Through the present cross-motions, each side seeks an award of summary

judgment in its favor.  Under the pertinent Federal Rule, summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In this case, the parties agree upon the operative facts, and disagree only on a question of

law — namely, whether the challenged decision lies within the scope of the arbitrator's

authority.

As Plaintiff acknowledges, this Court's scrutiny of the arbitrator's decision is

governed by a "very narrow" standard — indeed, "one of the narrowest standards of

judicial review in all of American jurisprudence."  Lattimer-Stevens, supra, 913 F.2d at

1169.  Specifically, an arbitrator's decision must be upheld so long as it "draws its

essence from the collective bargaining agreement," and does not reflect "merely [the

arbitrator's] own brand of industrial justice."  United Paperworkers Int'l Union v. Misco,

Inc., 484 U.S. 29, 36, 108 S. Ct. 364, 370 (1987) (internal quotation marks and citation

omitted).  The Sixth Circuit has explained that an arbitrator's award fails this test if "(1) it

conflicts with express terms of the [collective bargaining] agreement; (2) it imposes

7

additional requirements not expressly provided for in the agreement; (3) it is not

rationally supported by or derived from the agreement; or (4) it is based on general

considerations of fairness and equity instead of the exact terms of the agreement."

Michigan Family Resources, Inc. v. Service Employees Int'l Union Local 517M, 438

F.3d 653, 656 (6th Cir. 2006) (internal quotation marks and citations omitted).

    As is evident from the foregoing, an arbitrator's decision is not easily overturned.

The Supreme Court has explained that this is a deliberate byproduct of federal labor law:

> The reasons for insulating arbitral decisions from judicial review are
> grounded in the federal statutes regulating labor-management relations.
> These statutes reflect a decided preference for private settlement of labor
> disputes without the intervention of government . . . . The courts have
> jurisdiction to enforce collective-bargaining agreements; but where the
> contract provides grievance and arbitration procedures, those procedures
> must first be exhausted and courts must order resort to the private
> settlement mechanisms without dealing with the merits of the dispute.
> Because the parties have contracted to have disputes settled by an arbitrator
> chosen by them rather than by a judge, it is the arbitrator's view of the facts
> and of the meaning of the contract that they have agreed to accept.  Courts
> thus do not sit to hear claims of factual or legal error by an arbitrator as an
> appellate court does in reviewing decisions of lower courts.  To resolve
> disputes about the application of a collective-bargaining agreement, an
> arbitrator must find facts and a court may not reject those findings simply
> because it disagrees with them.  The same is true of the arbitrator's
> interpretation of the contract.  The arbitrator may not ignore the plain
> language of the contract; but the parties having authorized the arbitrator to
> give meaning to the language of the agreement, a court should not reject an
> award on the ground that the arbitrator misread the contract.  So, too, where
> it is contemplated that the arbitrator will determine remedies for contract
> violations that he finds, courts have no authority to disagree with his honest
> judgment in that respect . . . .  [A]s long as the arbitrator is even arguably
> construing or applying the contract and acting within the scope of his
> authority, that a court is convinced he committed serious error does not
> suffice to overturn his decision.

Misco, 484 U.S. at 37-38, 108 S. Ct. at 370-71 (citations omitted).

As discussed below, this standard of review is dispositive here. If the Court were to consider the matter *de novo*, it would almost certainly conclude that the challenged arbitration decision runs counter to sound policy considerations and awards relief that is excessive and unwarranted under the circumstances. Under the far more limited standard that governs the present inquiry, however, the Court finds that the arbitrator's decision is entitled to enforcement.

**B.    The Arbitrator's Decision Reflects an Appropriate Exercise of the Authority to Interpret and Apply the Terms of the Collective Bargaining Agreement.**

In support of its present motion, Plaintiff has identified four purported defects in the arbitrator's decision that Ronnie O'Neal should be reinstated with back pay. Upon considering these challenges in light of the above-cited standard of review, however, the Court finds that none of them provides a basis for overturning the arbitrator's award.

As its initial (and principal) challenge, Plaintiff contends that the arbitrator's decision fails in several respects to "draw its essence" from the terms of the parties' collective bargaining agreement ("CBA"). The starting point of the Court's analysis on this issue is the language of the CBA provision upon which the arbitrator chiefly relied in ordering O'Neal's reinstatement:

> The Hospital will give to an employee who is reprimanded or disciplined a copy of such action within three (3) scheduled work days of the infraction and simultaneously will furnish a copy to the appropriate Steward and/or Union Representative.

9

(Plaintiff's Response to Defendant's Cross-Motion, Ex. F, CBA Art. IX, § 3.)  Here, the arbitrator made a factual finding that Plaintiff did not give O'Neal notice of his discharge within three work days of his infraction — *i.e.,* his February 8 absence from his desk for over two hours without explanation.  In light of this violation of the CBA, the arbitrator determined that the appropriate remedy was reinstatement with back pay.

Plaintiff does not challenge the arbitrator's factual finding that it did not give O'Neal notice of his discharge within three work days after his February 8 infraction. Rather, Plaintiff asserts that such notice could not have been provided, where its management could not settle upon a particular form of discipline without first conducting a disciplinary investigative meeting, and where no such meeting could be held until after the above-cited three-day limit had already expired.  Under these circumstances, Plaintiff argues that any technical violation of the CBA's three-day requirement must be weighed against the due process considerations that are served by the DMC policy mandating an investigative meeting before an employee may be suspended or discharged.

Against this backdrop of competing concerns, Plaintiff contends that the arbitrator's decision fails in three respects to "draw its essence" from the terms of the CBA.  First, Plaintiff asserts that the arbitrator impermissibly "added" a penalty provision to the CBA by setting aside O'Neal's discharge and ordering his reinstatement as a remedy for the DMC's "technical" violation of the Article IX, § 3 requirement of three days' notice.  This provision, in and of itself, simply mandates that the DMC "will give"

the requisite notice within three scheduled work days, but does not specify the penalty for a failure to provide such notice.  Plaintiff argues that the arbitrator's award of reinstatement constitutes an "additional requirement[] not expressly provided for" in the CBA, thereby contravening the Sixth Circuit's standard for enforcement of an arbitrator's award, see Michigan Family Resources, 438 F.3d at 656, and also running afoul of the CBA term that prohibits the arbitrator from "add[ing] to, subtract[ing] from, or modify[ing] any of the terms" of the CBA, (see CBA Art. V, § 4).

This argument proves too much.  Under Plaintiff's rationale, *any* award of relief as a result of a violation of the three-day notice provision would impermissibly "add" to the terms of the CBA, as the agreement itself is silent regarding the appropriate remedy for such a violation.  Yet, Plaintiff acknowledged in its submissions to the arbitrator, at least as a fallback position, that an award of "nominal" back pay would be an appropriate remedy for any modest "procedural irregularity" in providing notice to O'Neal.  (See Plaintiff's Motion, Ex. A, Arb. Decision at 8.)  Moreover, as discussed below, Plaintiff points with approval to other arbitration rulings in which nominal awards of back pay were deemed to be the appropriate remedy for non-prejudicial violations of the CBA provision requiring three days' notice of disciplinary action.

Plaintiff's quarrel, then, is not with the arbitrator's "addition" of a penalty provision to the CBA.  It is, rather, that the penalty selected by the arbitrator is *too severe.*  Yet, as Plaintiff itself acknowledges in one of its submissions to the Court,

11

arbitrators ordinarily have a wide degree of latitude and flexibility in fashioning remedies for CBA violations, so long as this discretion is not limited by the express terms of the CBA.  See, e.g., Misco, 484 U.S. at 41, 108 S. Ct. at 372; General Telephone Co. v. Communication Workers, 648 F.2d 452, 456-57 (6th Cir. 1981).  Because the three-day notice provision is silent as to remedies, it certainly cannot be said that this provision limits an arbitrator's usual discretion to determine an appropriate award.  Moreover, with the one possible exception discussed immediately below, Plaintiff has not identified any other CBA provision that would permit an arbitrator to award back pay for a violation of Article IX, § 3, but deny him the authority to order an employee's reinstatement as a remedy for such a violation.

Plaintiff's next challenge, closely related to its first, is that the arbitrator improperly dispensed his "own brand of industrial justice," rather than confining his analysis and award to the terms of the CBA.  In support of this contention, Plaintiff cites the CBA's "management rights" clause, which grants the DMC the rights (i) to "suspend, discipline, [and] discharge," (ii) to "make and establish work rules of conduct and fix and determine penalties for violation of such work rules," and (iii) to "maintain discipline . . . among employees."  (CBA Art. XVIII, § 2.)  The arbitrator's award of reinstatement, in Plaintiff's view, usurped this management prerogative to determine the appropriate penalty for O'Neal's two-hour absence from his work site.

Once again, however, this argument sweeps too broadly.  Plaintiff's reasoning, if

accepted, would lead ineluctably to the conclusion that an arbitrator may ***never*** order an employee's reinstatement, once the DMC has exercised its (apparently unchecked) prerogative to discharge an employee for a violation of work rules. This proposition is not only implausible in its breadth, but, more importantly, is defeated by further language in the CBA's management rights clause that Plaintiff fails to address in its motion. Specifically, while this clause affirms the DMC's general right to make work rules and determine penalties for their violation, it further dictates that "such rights shall not be exercised by the Employer in contravention of any of the express provisions of this Agreement," and that "[a]ll of the rights of the Employer set forth in this Section shall be subject to the grievance procedure set forth in this Agreement." (CBA Art. XVIII, § 2.)

Plainly, then, the DMC cannot determine penalties for work rule violations in a way that runs afoul of express CBA provisions — including, of course, the three days' notice requirement at issue here. Nor can it claim that such determinations are shielded from an arbitrator's review — and, presumably, reversal, if the arbitrator deems this appropriate in a decision that "draws its essence" from the CBA — as this is the final step of the CBA's grievance procedure. Compare Morgan Services, Inc. v. Local 323, Chicago & Central States Joint Board, 724 F.2d 1217, 1221-24 (6th Cir. 1984) (finding that an arbitrator had improperly ordered an employee's reinstatement where the CBA provided that the employer could discharge an employee "without redress" in cases of "insubordination"). Accordingly, the Court discerns no inherent conflict between the

13

arbitrator's award of reinstatement and the authority reserved to the DMC under the "management rights" clause.

Neither can the Court accept Plaintiff's more limited argument that the arbitrator's award of reinstatement impermissibly usurped management prerogatives under the particular circumstances of this case, where the arbitrator identified only a procedural violation of the CBA's three-day notice provision.[3]  Again, just as Plaintiff has failed to identify any CBA provision that forbids the remedy of reinstatement for a violation of Article IX, § 3, it has not directed the Court's attention to any CBA language that limits the arbitrator's usual flexibility to fashion relief in cases involving "mere" procedural violations.  Nor does anything in the CBA's "management rights" clause confer any wider latitude for the DMC to override the agreement's "procedural" versus "substantive" requirements — rather, it is bound equally to comply with all of the CBA's "express provisions" in exercising its prerogative to "determine penalties for violations of . . . work rules."  (CBA Art. XVIII, § 2.)

Because the CBA does not impose any relevant restrictions upon the arbitrator's

---

[3]As noted by the Union, the DMC somewhat mischaracterizes the arbitrator's ruling on this point, repeatedly claiming throughout its motion that the arbitrator affirmed the validity of O'Neal's discharge on the merits.  (See, e.g., Plaintiff's Motion, Br. in Support at 14 (asserting that the arbitrator "found [O'Neal to have committed the infraction and the penalty to have been justified").)  The Court agrees with the Union that the arbitrator's decision is better read as declining to address the merits of the DMC's discharge decision, in light of his finding of a procedural violation in giving O'Neal notice of this decision.  (See Plaintiff's Motion, Ex. A, Arb. Decision at 16 (observing that "there are many aspects to this dispute which would have commanded the attention of the Arbitrator on [their] merits," but that these issues were "moot" in light of the finding of a procedural violation).)

14

authority to fashion an appropriate remedy for the DMC's violation of Article IX, § 3, his award must stand despite any reservations about its wisdom. If it were left to the Court to decide this question anew, it could hardly deny the force of Plaintiff's contention that O'Neal's reinstatement effectively rewards him for subverting the DMC's disciplinary investigative process. By repeatedly avoiding scheduled disciplinary investigative meetings, O'Neal certainly made it much more difficult, if not impossible, for the DMC to provide the prompt notice called for under Article IX, § 3. Yet, under the narrow standard of review that prevails here, the Court has "no authority to disagree with [the arbitrator's] honest judgment" that reinstatement was the appropriate remedy for Plaintiff's violation of the CBA. See Misco, 484 U.S. at 38, 108 S. Ct. at 371.

As its third and final example of the arbitrator's purported failure to remain with the scope of his admittedly broad authority, Plaintiff contends that the arbitrator improperly disregarded the prior decisions of two other arbitrators under similar facts, and instead awarded relief that these other arbitrators had deemed unwarranted. Yet, as Plaintiff concedes, prior arbitration decisions need not be accorded precedential (much less preclusive) weight in a subsequent arbitration proceeding. See, e.g., International Union, UAW v. Dana Corp., 278 F.3d 548, 555-57 (6th Cir. 2002); El Dorado Technical Services, Inc. v. Union General De Trabajadores de Puerto Rico, 961 F.2d 317, 321 (1st Cir. 1992); Blanchard v. Simpson Plainwell Paper Co., 925 F. Supp. 510, 516 (W.D. Mich. 1995). "Indeed, an arbitration award is not considered conclusive or binding in

15

subsequent cases involving the same contract language but different incidents or grievances," and "an arbitrator's refusal to follow a previous arbitrator's interpretation of a specific contractual provision does not expose an ensuing award to judicial tinkering." El Dorado Technical Services, 961 F.2d at 321.  Moreover, "absent a contractual provision to the contrary," the weight to be given to a prior arbitrator's ruling is itself a matter "to be determined by the arbitrator." Dana Corp., 278 F.3d at 557.  Thus, the arbitrator here was entitled to give the two prior arbitration decisions whatever weight he deemed appropriate.

In any event, the other arbitration decisions cited by Plaintiff are not nearly so favorable to its cause as suggested in its motion.  Significantly, the arbitrators in the two prior decisions both agreed that the three days' notice provision at Article IX, § 3 of the CBA was ambiguous, and created some tension with the DMC policy requiring that a disciplinary investigative meeting be held before the imposition of discipline that could result in suspension or termination.  (See Plaintiff's Motion, Ex. B, Arb. Decision at 10-11; Plaintiff's Motion, Ex. C, Arb. Decision at 6-7.)  This ambiguity necessarily gives rise to the possibility that two arbitrators could adopt different constructions of this provision, both of which are reasonable and equally "draw their essence" from the terms of the CBA.  See Dana Corp., 278 F.3d at 557-58 (upholding an arbitrator's award as resting upon a "reasonable construction of ambiguous terms," despite the fact that another arbitrator had construed these terms differently).

16

Indeed, one of these two prior arbitration decisions appears to have adopted a construction of Article IX, § 3 that is essentially the same as the one arrived at in the ruling at issue here.  Specifically, arbitrator Richard Mittenthal ***rejected*** the DMC's position that an "infraction" does not occur — and, therefore, the three-day period for giving notice of disciplinary action arising from this infraction does not begin to run — until after a disciplinary investigative meeting is held and the DMC's management determines an appropriate penalty.  (<u>See</u> Plaintiff's Motion, Ex. C, Arb. Decision at 6-7.) Although he "recognize[d] that this interpretation may not be consistent with the DMC's own Progressive Discipline policy," the arbitrator explained that "the language of the [CBA] must prevail over the policy."  (<u>Id.</u> at 7.)

The arbitrator in this case employed essentially the same reasoning.  Moreover, the arbitrators in this and the prior case both agreed that the DMC had violated the procedural obligation imposed under Article IX, § 3 by failing to provide notice of a disciplinary action within three scheduled work days of the infraction that led to the discipline, even though an disciplinary investigative meeting had not yet been held and an appropriate penalty had not yet been determined by the end of this three-day period. The only point of disagreement between the two arbitrators, then, was as to the appropriate ***remedy*** for such a violation, with arbitrator Mittenthal concluding that a modest award of back pay was sufficient because "the failure to provide prompt written notice did not adversely affect [the employee] in any way."  (<u>Id.</u>)

17

As explained earlier, the relief awarded in this case did not exceed the arbitrator's considerable authority to fashion an appropriate remedy, nor did it transgress any express provision of the CBA. Accordingly, even though another arbitrator might have chosen a more limited remedy under similar circumstances, and even if the arbitrator here could be fairly accused of paying insufficient heed to the reasoning of other arbitrators, see Dana Corp., 278 F.3d at 557 (observing that "[a]s a practical matter, arbitrators should take into consideration prior arbitration decisions involving the same provision of the collective bargaining agreement"),[4] the award in this case nonetheless drew its essence from the terms of the CBA. This suffices for the arbitrator's decision to withstand judicial scrutiny.

Plaintiff's remaining three challenges warrant little discussion. First, Plaintiff contends that the arbitration award should be set aside as "procured . . . through fraud," Misco, 484 U.S. at 38, 108 S. Ct. at 371, in light of the purported testimony of the local union president at the arbitration hearing (i) that 10-12 cases had arisen involving the CBA's three days' notice provision, but (ii) that the parties "never had to go to arbitration on the 'three day rule' because they always settled." (Plaintiff's Motion, Br. in Support

---

[4]As noted by the Union, it is not evident from the record that the arbitrator failed to consider the two prior arbitration decisions submitted by the DMC. To the contrary, in denying the DMC's petition for reconsideration, which relied heavily on and quoted extensively from these prior decisions, the arbitrator stated that he had "carefully reviewed" the DMC's submission but found "no basis for reaching a conclusion different from the one stated" in his initial ruling. (Plaintiff's Motion, Ex. E.)

18

at 15.)[5]  Plaintiff asserts that this testimony was demonstrably false, given that arbitrators had, in fact, construed this CBA provision in the two decisions discussed earlier.

Even accepting that the local union president testified as Plaintiff says he did, this is manifestly insufficient to establish that the arbitration award was procured through fraud.  In order to set aside an award on this ground, Plaintiff must show "(1) clear and convincing evidence of fraud, (2) that the fraud materially relates to an issue involved in the arbitration, and (3) that due diligence would not have prompted the discovery of the fraud during or prior to the arbitration."  International Brotherhood of Teamsters, Local 519 v. United Parcel Service, Inc., 335 F.3d 497, 503 (6th Cir. 2003).  The third prong of this standard, at least, is plainly not satisfied here, as the DMC not only could have discovered but was ***fully aware*** during the arbitration of the allegedly fraudulent nature of the local union president's testimony.  What is more, the DMC took affirmative steps to overcome this "fraud" by submitting a petition for reconsideration that both (i) directed the arbitrator's attention to prior arbitration decisions that, contrary to the alleged testimony of the local union president, had considered the meaning of the CBA's three days' notice provision, and (ii) expressly raised the claim that the local union president had testified falsely at the arbitration hearing.  In denying this petition, the arbitrator

---

[5]As noted by the Union, the DMC has not produced any evidence of any such testimony at the arbitration hearing, but rather offers only its bare assertion in its brief that the local union president so testified.  The arbitrator's decision provides only partial support for this assertion, stating that "testimony indicated about 10 or 12 disputes have arisen involving the subject clause," but giving no hint as to the resolution of these prior disputes.  (See Plaintiff's Motion, Ex. A, Arb. Decision at 13.)

19

explained that he had "carefully reviewed" the record and the DMC's arguments but found "no basis" for deviating from his initial ruling.  (Plaintiff's Motion, Ex. E.)  Thus, any effort to deceive the arbitrator did not succeed, and the arbitrator stood by his decision despite being made aware of this purported "fraud."[6]

Plaintiff next suggests that the arbitrator's decision impermissibly violated Ronnie O'Neal's right to due process.  Initially, it is difficult to see how a decision that ordered O'Neal's reinstatement for lack of timely notice of disciplinary action could possibly be viewed as a threat to *O'Neal's* due process rights.  In any event, this contention rests upon the false premise, pervasively stated and restated throughout Plaintiff's submissions to this Court, that it would somehow be difficult, if not impossible, for the DMC to comply with the CBA's requirement of three day's notice while still conducting the disciplinary investigative meeting called for under the DMC's human resources policies.  Since this latter meeting is intended to protect an employee's due process rights by giving him an opportunity to be heard and to refute the charges against him before he is suspended or discharged, the DMC surmises that the net effect of the arbitrator's decision would be to diminish the due process rights of its employees.

Leaving aside, for the moment, the correctness of this premise, the simple fact is that an arbitrator need not — and, indeed, ought not — allow such concerns about

_____

[6]In any event, the Court already has observed that the prior arbitration awards that were "concealed" from the arbitrator would have done little or nothing to undercut his reasoning as to the proper meaning of the three days' notice provision.

possible due process "ripple" effects to divert him from the task at hand:  namely,

resolving the dispute before him in accordance with the terms of the CBA.  "An

arbitrator's power is both derived from, and limited by, the collective-bargaining

agreement," and "[h]e has no general authority to invoke public laws that conflict with

the bargain between the parties."  Barrentine v. Arkansas-Best Freight System, Inc., 450

U.S. 728, 744, 101 S. Ct. 1437, 1446 (1981).  As noted earlier, the prior arbitration

decision by Richard Mittenthal that Plaintiff holds in such esteem appears to

acknowledge this point, stating that its interpretation of the three days' notice provision

"may not be consistent with the DMC's own Progressive Discipline policy," but that "the

language of the [CBA] must prevail over the policy."  (Plaintiff's Motion, Ex. C, Arb.

Decision at 7.)

In any event, it is far from evident to the Court that there is an intractable conflict

between the CBA's notice provision and the DMC's policy calling for a disciplinary

investigative meeting.  As explained in Arbitrator Mittenthal's decision, the CBA's

reference to an "infraction" could plausibly be read as contemplating an ***alleged***

infraction.  (See id. at 6-7.)  In this view, then, the CBA provision in question would

reflect the parties' "anticipation [of] an immediate investigation and determination as to

whether the alleged 'infraction' warranted 'discipline.'" (Id. at 7.)  So long as this initial

process is completed and notice of intended discipline is given to the employee within

three days, the CBA provision is satisfied.  Nothing about this requirement denies the

21

DMC the opportunity to *then* convene the required disciplinary investigative meeting before actually *imposing* discipline that could result in suspension or discharge. Presumably, an employee would not complain if, as a result of a subsequent disciplinary investigative meeting, the DMC ultimately decides not to impose the discipline reflected in the notice previously given to the employee under the terms of the CBA.

This same reasoning defeats Plaintiff's final, closely related contention that the arbitrator's decision should be vacated as contrary to public policy. To the extent that this argument rests on the notion that a "mere" procedural violation ought not be sufficient to contravene the DMC's usual authority to discipline and discharge employees for work rule violations, the Court already has explained that the arbitrator's award of reinstatement did not exceed his considerable discretion to fashion an appropriate remedy. To the extent that Plaintiff's public policy challenge is grounded in due process concerns, the Court again observes that the arbitrator's decision did not in any way infringe upon the due process rights of the parties to this case. Even if it were appropriate to speculate about the long-term impact of this decision upon the due process rights of DMC employees, the Court fails to perceive the threat posited by Plaintiff.

The Court fully recognizes and appreciates Plaintiff's concern that the arbitrator's decision in this case effectively rewards Ronnie O'Neal for his repeated efforts to delay a disciplinary investigative meeting that, after all, serves the important purpose of allowing him to present his side of the story before management decides to impose any discipline.

22

Nonetheless, the Court may not overturn an arbitrator's award merely because it seems unwise or contrary to sound policy considerations. While this Court almost certainly would have resolved the matter differently, that is not the test for determining whether to enforce or vacate an arbitrator's decision. "Regardless of what [this Court's] view might be of the correctness of [the arbitrator's] contractual interpretation, the Company and the Union bargained for that interpretation," and "[a] federal court may not second-guess it." W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 765, 103 S. Ct. 2177, 2183 (1983). The decision at issue here draws its essence from the parties' contract, and this Court therefore must uphold it.

## IV. <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion for

summary judgment is DENIED, and that Defendant's motion for summary judgment is

GRANTED.  In light of these rulings, IT IS FURTHER ORDERED that Defendant's

motion to supplement its motion for summary judgment is DENIED AS MOOT.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  March 28, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 28, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager